JUDGE SCHOFIELD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

OSCAR SMITH,



Plaintiff,

**COMPLAINT**

-against-

**JURY TRIAL
DEMANDED**

THE CITY OF NEW YORK, INSPECTOR
DAVID T. DRISCOLL, LIEUTENANT JOHN HARKINS,
SERGEANT PAUL REYNOLDS, SERGEANT TERRY
SULLIVAN, and SERGEANT JAMES CHYLINSKI,



Defendants.

----------------------------------------------------------------X

Plaintiff OSCAR SMITH by his attorneys, Siegel Teitelbaum & Evans, LLP, and the

Law Office of Rachel Nicotra, as and for his COMPLAINT, upon information and belief, alleges

the following:

## PRELIMINARY STATEMENT

1.      This is a civil action for damages instituted pursuant to the provisions of 42 U.S.C.

Section 2000e *et seq.* of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. Section

1981 of the Civil Rights Act of 1866, as amended ("§1981"), 42 U.S.C. Section 1983 of the Civil

Rights Act of 1871, as amended ("§1983"), the New York State Executive Law, Section 290 *et*

*seq.* (the "New York State Human Rights Law"), and the New York City Administrative Code

Section 8-101 *et seq.* (the "New York City Human Rights Law"). Plaintiff OSCAR SMITH

("Plaintiff" or "SMITH") brings this action against THE CITY OF NEW YORK  ("CITY"),

INSPECTOR DAVID T. DRISCOLL   ("DRISCOLL"), LIEUTENANT JOHN HARKINS

("HARKINS"), SERGEANT PAUL REYNOLDS ("REYNOLDS"), SERGEANT TERRY

SULLIVAN ("SULLIVAN"), and SERGEANT JAMES CHYLINSKI ("CHYLINSKI" and

collectively "Defendants").

2.      SMITH, a mixed-race African American male and avid surfer and diver, served as a member of the Scuba Unit within the Harbor Division, an essentially Caucasian enclave within the New York City Police Department ("NYPD"). There, based on his race and his non-conformance with gender stereotypes, Smith was subjected to a constant barrage of derogatory and ignorant comments. His supervisors and co-workers expressed open disbelief that a "black man" could pass a swim test and commented that he was "dumb but strong" because he was "descended from slaves." Because SMITH painted his toenails (a common trend for surfers) and is well groomed, his supervisors and co-workers accused him of being "gay" and "transsexual" and told him to start a porn site called "trannycop.com" In addition to the offensive comments, SMITH was repeatedly and regularly denied career-enhancing training, promotions and overtime. SMITH continually opposed the offensive comments and complained about the denial of training and overtime. Despite his complaints, the NYPD's supervisors took no action on SMITH's behalf and in fact perpetuated the mistreatment by acquiescing to, and directly taking part in, the discriminatory conduct. Eventually, the hostility became so extreme, that SMITH was forced—at a great cost financially and emotionally—to prematurely retire from a career he loved with the NYPD.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction of the action pursuant to 28 U.S.C. §1331, Title VII, §1981, §1983 and 28 U.S.C. 1343(a)(3-4).  The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. 1367. In addition, all conditions precedent to jurisdiction under Title VII have been complied with, in that Plaintiff filed charges of employment discrimination and

retaliation with the Equal Employment Opportunity Commission (the "EEOC" or the "Commission") within 300 days of the unfair employment practices and the Plaintiff received the requisite right to sue notification from the Commission.

4.      Venue properly lies in this judicial district pursuant to 28 U.S.C. Section 1391(b) and (c) and 42 U.S.C. Section 2000e-5(3), in that Defendant CITY OF NEW YORK maintains an office within this judicial district, and a substantial part of the events constituting the discrimination have taken place within this judicial district.

## PARTIES

5.      Plaintiff SMITH, a resident of Brooklyn, New York, was at all relevant times an employee of the NYPD.

6.      Defendant CITY OF NEW YORK is a municipal entity created and authorized under the laws of the State of New York to maintain a Police Department that acts as its agent in the area of law enforcement and for which it is ultimately responsible. The defendant City of New York assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

7.      Defendant DRISCOLL is and was at all relevant times the commanding officer of the Harbor Division.  He is being sued in his official and individual capacity.

8.      Defendant HARKINS is and was at all relevant times commanding officer of the Scuba Unit.  He is being sued in his official and individual capacity.

9.      Defendant REYNOLDS is and was at all relevant times a supervisor within Scuba Unit.  He is being sued in his official and individual capacity.

3

10.     Defendant SULLIVAN is and was at all relevant times a supervisor within Scuba Unit. He is being sued in his official and individual capacity.

11.     Defendant CHYLINSKI is and was at all relevant times a supervisor within Scuba Unit. He is being sued in his official and individual capacity.

## BACKGROUND

12.     SMITH, a mixed race African American male, was hired as a patrol officer by the NYPD in December, 1997. Plaintiff's performance on patrol was at all times satisfactory. Plaintiff received several commendations and awards in recognition of his excellent service.

13.     Prior to his hire and throughout his tenure with the NYPD, SMITH has been an avid surfer and diver and has adopted many of the styles common within the surfing culture. SMITH has painted toenails, wears toe rings, shaves his body hair and wears a hoop earring.

14.     Prior to his hire and throughout his tenure with the NYPD, SMITH has worked as a personal trainer and has close ties to the fashion industry. SMITH reads fashion and style publications, is well groomed and associates with gay and transsexual individuals.

15.     In 2003, SMITH applied (by taking a written test as well as a water aptitude test) to the NYPD's Scuba Unit.

16.     SMITH was well suited and qualified for the position. In addition to being a long-time surfer, SMITH was a Grade III Ocean Lifeguard, an Advanced Open Water Diver, a Triathlete, and a United States Lifeguard Association (USLA) member and active competitor.

17.     The Scuba Unit is operated under the umbrella of the NYPD's Harbor Division, which is responsible for patrolling New York City waterways. There are approximately 150 officers in the Harbor Division. The Scuba Unit, with approximately 30 members, responds to

near and offshore air-sea rescues and all waterborne accidents involving any water submersions of occupied vehicles, boats and aircrafts.

18.    The Harbor Division, and the Scuba Unit, are, and have historically been, comprised almost entirely of Caucasian male officers.

19.    In 2003, when SMITH applied, there were no African Americans on the Scuba Unit.

20.    Shortly after applying, SMITH's sergeant from the 10th precinct notified SMITH that he had been accepted into the Scuba Unit. However, just prior to SMITH's scheduled transfer, his sergeant told him that the Commanding Officer of the Unit said that "black guys couldn't swim" and as long as he was in charge no "black guy" would come into his Unit. Thus, despite the fact that SMITH was qualified for the position, he was forced to remain on patrol.

21.    In 2006, the commanding officer of the Harbor Division retired and DRISCOLL, then a Captain, took charge of the Division.

22.    In 2006, SMITH again applied and was accepted for the Scuba Unit.

23.    Beginning in March 2006 and continuing up until the time of his separation in May of 2013, SMITH was the only African American on the Scuba Unit. During that time period, out of approximately 150 members in the entire Harbor Division, there were only two other African American members in addition to SMITH.

## EVENTS COMPRISING THE CURRENT LAWSUIT

24.    Beginning in March 2006 and continuing up until the time of his separation in May of 2013, SMITH was subjected to a hostile work environment, ostracized, discriminated against, and marginalized, denied overtime and career enhancing training, subjected to disparate

discipline and was ultimately constructively discharged from his employment based on his race and non-conformity with gender-stereotypes.

## HOSTILE WORK ENVIRONMENT

25.     Beginning in March 2006 and continuing up until the time of his separation in May of 2013, HARKINS, SULLIVAN, REYNOLDS, CHYLINSKI and SMITH's co-workers, in the presence of his supervisors, subjected SMITH to egregious derogatory comments, including, but not limited to the following:

a.   Upon entering the Scuba Unit, HARKINS repeatedly asked SMITH how it was that a "black man" could have passed the swim test.

b.   HARKINS thereafter regularly referred to SMITH as the "black guy" and said that SMITH was "different" and that he brought a "different element to the team."

c.   Upon entering the Scuba Unit, and continuing thereafter, REYNOLDS referred to SMITH as the "black guy" and "Shaft."

d.   Upon entering the Scuba Unit, and continuing thereafter, SULLIVAN, and a Caucasian officer repeatedly referred to SMITH as a "token."

e.   Upon entering the Scuba Unit, and continuing thereafter, an officer repeatedly referred to SMITH as "tautog." When SMITH asked the officer the meaning of "tautog" the officer told SMITH that it means a "blackfish." Thereafter, SMITH was referred to as both "tautog" and "blackfish." SMITH told the officer that he found the nickname offensive. Defendants HARKINS, REYNOLDS and SULLIVAN were present during these comments, and

SMITH's opposition to this moniker, and took no action on SMITH's behalf.

f.  The same officer also told SMITH that he had an extra bone in his ankle that made him athletically adept. SMITH told the officer that he found the comment offensive. Defendants HARKINS, SULLIVAN and REYNOLDS were present during these comments and SMITH's opposition to the comments, and took no action on SMITH's behalf.

g.  Another officer told SMITH that he was "dumb but strong" since he was "descended from slaves." SMITH told the officer that he found the comment offensive. Defendants SULLIVAN and REYNOLDS were present during these comments, and SMITH's opposition, and took no action on SMITH's behalf.

h.  SMITH's co-workers also made offensive comments about his genitalia. During one conversation, an officer commented that if SMITH were "black" he would have a big penis. Other co-workers then commented that SMITH had a "chocolate cheese-doodle." Thereafter SMITH was regularly referred to as "chocolate cheese doodle." SMITH told the officers that he found the comment offensive. Defendants CHYLINSKI and REYNOLDS were present during these comments and SMITH's opposition to the comments, and took no action on SMITH's behalf.

i.  SMITH's coworkers also ridiculed SMITH for using body moisturizer. On one occasion an officer, in the presence of CHYLINSKI, stated that SMITH was moisturizing because he had gotten "ashy" and therefore must be "black."

Defendant CHYLINSKI was present during these comments, and SMITH's opposition, and took no action on SMITH's behalf.

j.   CHYLINSKI and SMITH's coworkers called him "gay" and ridiculed him for getting pedicures, having painted toenails, wearing toe-rings, shaving his body hair and wearing an earing. SMITH objected to these comments in the presence of HARKINS, REYNOLDS, SULLIVAN and CHYLINKSKI. Despite his objections, none of SMITH's supervisors took any action on his behalf.

k.   CHYLINSKI and SMITH's fellow officers made fun of SMITH for reading GQ and the Metro Section of The New York Times and called him "metrosexual."

l.   CHYLINSKI, REYNOLDS and SULLIVAN and SMITH's fellow officers told SMITH that he must have been raised by a "bunch of girls" because he was "sensitive."

m.   CHYLINSKI and several of SMITH's fellow officers made fun of SMITH for not knowing how to change the engine oil on a boat, told him that he was not "mechanically inclined," called him a "bitch" and ordered him to get them sodas.

n.   In 2009, SMITH got married in Brazil. Upon returning with photos from the wedding, SMITH was ridiculed by CHYLINSKI, REYNOLDS and several of his coworkers based on the fact that a transsexual attended his wedding.

o.   CHYLINSKI, REYNOLDS and several of SMITH's coworkers accused

SMITH of going to Brazil to get a sex change, stated that SMITH's wife was a she-male and that SMITH's marriage was a sham to cover up his homosexuality.

p.  CHYLINSKI called SMITH a "she-male" and told him to start a website called "trannycop.com."

q.  CHYLINSKI, REYNOLDS, HARKINS and several of SMITH's coworkers accused SMITH of having a sexual relationship with a coworker with whom he regularly surfed. The comments occurred on numerous occasions. The coworker eventually stopped associating with SMITH.

r.  When SMITH asked CHYLINSKI and his coworkers to stop making sexual offensive comments, they mocked him further asking, "do you have sand in your vagina?", "does your vagina hurt?", and by telling him "put on your big-boy pants" and "be a man."

s.  REYNOLDS, CHYLINSKI and SMITH's coworkers continually asked SMITH his race and accused him of changing his race every week.

t.  CHYLINSKI and several of SMITH's coworkers regularly referred, in SMITH's presence, to African Americans as spear-chucker, coon, porch monkey and lawn jockey.  SMITH objected to the use of the racial slurs and told CHYLINSKI and his co-workers that the slurs were offensive. Despite his objections, the racial comments did not cease.

u.  On one occasion, CHYLINSKI referred to a Hispanic individual as a "Spic." When SMITH objected to the use of the term, CHYLINSKI responded, "what

are you Spanish today? Will you pick a race and let us know in advance."

    v.   Beginning in the spring of 2012 and continuing to May of 2013, CHYLINSKI and REYNOLDS regularly tuned the office television to the hunting channel. The channel used a confederate flag as its backdrop. When SMITH stated that he found the backdrop of the channel offensive, and that he believed that the flag had connotations of slavery, CHYLINSKI responded, "[w]hat, are you afraid you are going to get hung?" On another occasion, following another discussion about the confederate flag and SMITH's objection to it (and in front of CHYLINSKI) an officer responded, "[w]e own you, Oscar." Again, despite SMITH's opposition to the comments, no action was taken on his behalf.

26.    Beginning in March 2006 and continuing up until the time of his separation in May of 2013, HARKINS, SULLIVAN, REYNOLDS, and CHYLINSKI ostracized, marginalized, discriminated against, and demeaned SMITH, and interfered with his career progression, including, but not limited to, the following:

    a.   HARKINS, SULLIVAN and REYNOLDS regularly excluded SMITH from food orders during work and did not invite him to drinks after work.

    b.   In August 2007, SULLIVAN assigned SMITH to the Air Sea rescue Unit. There was no overtime available in the Unit and the schedule interfered with SMITH's ability to work his second job as a personal trainer. While Caucasian officers only worked the assignment for a few months, and despite SMITH continual requests to return to the Unit, SMITH remained in the

assignment for close to one year.

c.  In December 2008, SULLIVAN contacted IAB and requested that SMITH be monitored. When SMITH asked an IAB Lieutenant why he was being monitored he was told that SULLIVAN said that SMITH was a "problem."

d.  In January of 2009, SMITH was denied the opportunity to participate in a high-profile search and rescue. When U.S. Airways Flight 1549 landed in the Hudson River, SMITH was not called upon to participate despite the fact that he was one of the Unit's strongest swimmers. Instead REYBOLDS selected less-qualified junior Caucasian members. When SMITH later asked REYNOLDS why he was not chosen, REYNOLDS, in the presence of DRISCOLL, responded, "[y]ou're not good enough to be part of this operation."

e.  In, or about February 2011, a Caucasian member of the Scuba Unit, with less seniority than SMITH, was promoted to Detective. SMITH asked REYNOLDS why his colleague was promoted and he was not. REYNOLDS responded, "the Chief wanted a name and I didn't give him yours."

f.  In or about March 2012, SMITH was promoted to Detective. However, CHYLINSKI, REYNOLDS and DRISCOLL failed to inform SMITH that he had been promoted and did not tell SMITH that he was required to report to the ceremony on his scheduled day off. Had SMITH not learned of the promotion from his colleague who was also being promoted he would have missed the ceremony and would not have been promoted.

11

27.    Beginning in March 2006 and continuing up until the time of his separation in May of 2013, SMITH was subjected to unwarranted and baseless discipline, including, but not limited to the following:

a.    Between the summer of 2008 and the summer of 2009, SMITH was issued a series of unwarranted command disciplines ("CD"s) based on ministerial mistakes.

b.    In 2010, SMITH was issued a CD for not updating his paperwork regarding his recent marriage despite the fact that SMITH had in fact completed the required paperwork and had informed his Union and Human Resources.

c.    In May of 2010, SMITH was issued a CD for failing to attend Cobra Training while his Caucasian colleague who also missed the training was issued only a warning.

d.    In 2010, SMITH was given a CD for not submitting an off-duty employment request. Upon receiving the CD, SMITH immediately submitted the request. SMITH, subsequently timely submitted off-duty employment requests for 2011, 2012 and 2013.

e.    In August of 2012, SMITH was brought up on Charges and Specs for duplicating his Parking Permit. SMITH was also charged with not submitting his off-duty employment request forms despite the fact that he had done so yearly and had already been issued a CD for the one year that he was late. SMITH accepted a thirty-day suspension for the duplication of his parking permit.

f. That same month, SMITH received a CD for parking at a parking meter.

g. SMITH was additionally charged with not updating his marital status despite the fact that he was already issued a CD for that infraction in 2010 and had in fact updated his information. SMITH accepted a sixteen-hour suspension for parking at a meter.

**DENIAL OF OVERTIME**

28. Beginning in March 2006 and continuing up until the time of his separation in May of 2013, SMITH was denied overtime based on his race and non-conformity with gender-stereotypes.

29. Despite the fact that SMITH continually requested both planned and unplanned Scuba Unit specific overtime, he was repeatedly denied the overtime in favor of Caucasian members of the Unit with equal and/or less seniority.

30. While some of the Caucasian officers worked thirty-five hours a month in overtime, SMITH worked less than thirty-five hours of overtime in a year.

31. Between the years of 2006 and 2013, despite SMITH's repeated requests, he was repeatedly denied the following and other regularly occurring Scuba Unit overtime in favor of Caucasian members of the Unit with equal and/or less seniority:

a. Presidential Overtime: Every time the President or international dignitary visits New York, the Scuba Unit is tasked with securing and clearing the waterways. Scuba members regularly perform this task on overtime.

b. July 4th Overtime: Prior to July 4th, the Scuba Unit is entrusted with sweeping the barges.

    c.  <u>Fleet Week Overtime</u>: Prior to, and during, Fleet week, the Scuba Unit was tasked with sweeping the tugboats and New York waterways.

    d.  <u>Ponch Camp Overtime</u>: Every spring April/May Scuba Unit members transport, and set up equipment, for a camping trip run by the Boy Scouts of America.

32.    In 2012, SMITH asked an administrative lieutenant and sergeant why he was not receiving overtime. The supervisors told SMITH that he was "not one of the Captain's [DRISCOLL's] favorites."

33.    Because SMITH was denied Unit specific overtime, planned and unplanned, his annual earnings in the Scuba Unit were lower than his earnings prior to his entrance into the Unit.

34.    The denial of overtime between the years of 2006 and 2013 caused SMITH substantial financial harm. Further the denial of the planned and unplanned overtime has had substantial detrimental effects on SMITH's pension.

## DENIAL OF CAREER ENHANCING TRAINING

35.    Beginning in March 2006 and continuing up until the time of his separation in May, 2013, SMITH was denied career-enhancing training based on his race and non-conformity with gender-stereotypes.

36.    Despite SMITH's continual requests for specialized training, Defendants repeatedly selected Caucasian members of the Unit with equal and/or less seniority to attend career-enhancing training, including, but not limited to the following:

    a.  <u>Dive Master Training</u>: Dive Master Training allows an officer to supervise

other officers on rescue missions.

b.  Pilot Training for 36' and 55' Boats: Pilot Training allows members to operate boats and direct rescue missions.

c.  Captain Navigation Training: Captain Navigation Training, also known as "100 ton license," enables a member to operate the Scuba Launch and provides post-retirement opportunities operating tugboats and yachts.

d.  Sonar Training: Sonar training provides members with skills necessary to search the open water using high tech sonar equipment.

e.  ROV Training: Remotely Operated Vehicles ("ROV") Training enables members to operate department ROV's during underwater searches.

f.  Hydro Testing Training: Hydro Testing Training provides members with the skills necessary to inspect the tanks used for dive operations.

g.  AGA Mask Repair Training:  AGA Mask Repair Training provides members with knowledge necessary to inspect and work on the AGA masks used daily during dive operations.

h.  Air Compressor repair training:   Air Compressor repair training allows members to operate and maintain the Unit compressors.

37.    When SMITH complained to HARKINS, SULLIVAN and REYNOLDS about the repeated denial of overtime and training, they told him that he was a "trouble maker," that he was "lucky to be in the Unit," and that he should work on "fitting in better."

38.    SMITH also complained to CHYLINSKI about the denial of overtime and training. On two occasions, once in the presence of REYNOLDS, CHYLINSKI responded,

"[w]hat are you gonna do, sue?" CHYLINSKI's comment was most likely related to the fact that SMITH had participated in a class action lawsuit against the NYPD concerning discriminatory treatment of African American and Hispanic officers.

39.   As a result of the denial of specialized training and assignments, SMITH has been denied the opportunity to earn overtime for training and overtime assignments requiring specialized training. Further, the denial of specialized training has denied SMITH the ability to participate in lucrative post-NYPD career opportunities.

## COMPLAINTS, RETALIATION, AND CONSTRUCTIVE DISCHARGE

40.   Beginning in March 2006 and continuing up until the time of his separation in May of 2013, SMITH opposed the discriminatory conduct. Following his opposition, Defendants' subjected Plaintiff to increased hostility. In addition, in 2008, 2012 and 2013, SMITH complained about the discriminatory conduct. Following each complaint of discrimination, SMITH was retaliated against.

41.   In May 2008, SMITH approached DRISCOLL and told DRISCOLL that he was being picked on and denied overtime. DRISCOLL told SMITH to go through the chain of command and refused to speak to SMITH further.

42.   Because SMITH did not believe that his immediate supervisors, HARKINS, SULLIVAN and REYNOLDS, who were in fact discriminating against him, would take any action he complained anonymously to the IAB.

43.   In or about May 2008, SMITH anonymously told the IAB that he had witnessed SULLIVAN picking on the "black guy" in the Unit. Despite this complaint, IAB did not conduct any investigation.

44.    Following his complaint to the IAB, in May of 2008, SMITH was immediately retaliated against. First, Defendant SULLIVAN assigned SMITH to desk duty for one month (an unusual assignment for an officer who is not on modified duty).    When SMITH asked SULLIVAN about his assignment, SULLIVAN told SMITH that it was to "get [his] head right."

45.    The following month SULLIVAN told SMITH that he was "uncontrollable" and that he did not want SMITH in his squad.

46.    Shortly thereafter HARKINS transferred SMITH to the A squad. The transfer had a negative impact on SMITH's ability to work his second job.

47.    SMITH was also immediately subjected to baseless discipline. In or about June of 2008, the Integrity Control Officer ("ICO") gave SMITH a CD for not updating his personal information contained on an index card, referred to as a "10 card." When SMITH questioned why he was getting a CD (officers normally receive only a warning), the ICO told him that DRISCOLL had instructed him to "keep on [SMITH]." Between June 2008 and June 2009, SMITH received six more unwarranted CDs.

48.    Beginning in early 2012 and continuing until May of 2013, the treatment became so hostile that SMITH began suffering from anxiety.

49.    In May of 2012, SMITH's co-workers threatened SMITH with violence in CHYLINSKI's presence, stating that SMITH "might not wake up from an overnight tour" or could "drown in a diving op."    CHYLINSKI laughed at the comments and took no action on Smith's behalf.

50.    In February of 2012, SMITH again complained to REYNOLDS about the harassment that he was enduring and specifically requested a transfer out of the Unit.

REYNOLDS told SMITH that DRISCOLL would not approve his transfer.

51.  In August of 2012, SMITH was brought up on Charges and Specs for duplicating his parking permit. SMITH accepted the penalty for the duplication of his permit.

52.  In addition, and in retaliation for SMITH's complaints about discrimination, the Charges and Specs also included a charge for the failure to apply for off-duty employment despite the fact that SMITH annually completed the necessary forms.

53.  In August of 2012, SMITH was also issued a CD that included a baseless charge for failing to update his marital status. Again, SMITH had already received a CD for that infraction and had in fact updated his paperwork.

54.  In early 2013, Smith again complained anonymously to the IAB. Again, the IAB did not undertake any investigation.

55.  In April, 2013, unable to bear the abuse any longer, SMITH informed DRISCOLL that he was leaving the NYPD.

56.  Shortly thereafter, SMITH complained to the XO of the Harbor Division about the derogatory comments, the denial of training and overtime and the hostility he endured from CHYLINSKI, REYNOLDS, SULLIVAN, HARKINS and his coworkers. The XO forwarded SMITH's complaint to the NYPD's Office of Equal Employment Opportunities ("OEEO"). In May, 2013, SMITH was contacted by the OEEO and interviewed.

57.  Almost immediately thereafter, while SMITH was out of work sick, six officers showed up at his home. The officers told SMITH that DRISCOLL had sent them to "check up on him" and accused SMITH of "sick leave" violations. After agreeing that SMITH was not in violation of sick-leave policies, an officer from the IAB told SMITH that he was being brought

up on Charges and Specs and would be placed on modified duty. The officers took SMITH's guns and ID and told him to report to NYPD Headquarters at One Police Plaza ("1PP").

58.    At 1PP SMITH was forced to undergo a psychological evaluation, was issued a modified duty ID and was assigned to the Special Operations Division ("SOD") Wheel. The assignment is generally considered a punishment.

59.    At no point was SMITH presented with Charges and Specs. Further, the alleged infraction, relating to the duplication of a parking permit in June, 2012, was adjudicated in August of that year and SMITH already had been penalized with a thirty-day suspension.

60.    In May, 2013, the OEEO contacted SMITH and told him that his claim of discrimination would not be investigated because of the pending Charges and Specs.

61.    As a result of the baseless charges, SMITH is now unable to carry a weapon as such has been denied the career opportunities available to other officers post-retirement.

62.    As a result of NYPD's severe discriminatory and abusive treatment, and its refusal to take any action on SMITH's behalf, SMITH was forced to retire after only fifteen years of service even though it was always his intention to complete twenty years of service.

63.    As a result of his premature retirement, SMITH has suffered a substantial loss to his pension and future earnings.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Discrimination Under Title VII)

64.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "63" inclusive with the same force and effect as though more fully set forth herein again and length.

65.    Defendant CITY OF NEW YORK discriminated against Plaintiff on account of

his race by denying him overtime, career enhancing training and prestigious assignments in favor of Caucasian officers with the same or less qualifications and seniority.

66.    Defendant CITY OF NEW YORK discriminated against Plaintiff on account of his race and based on his sex (and gender stereotypes) by subjecting him to a severe and pervasive hostile work environment and by intentionally creating an intolerable hostile work atmosphere that left the Plaintiff with no other choice but to resign from the NYPD.

67.    The CITY OF NEW YORK's conduct was intentional, malicious and in reckless disregard of Plaintiff's protected rights under Title VII.

68.    As a result of the CITY OF NEW YORK's intentional discrimination against the Plaintiff, Plaintiff has sustained injury to his career and suffered stress and economic damages and other injury.

69.    By reason of the foregoing, Defendant CITY OF NEW YORK has violated Title VII of the Civil Rights Act, and Plaintiff is entitled to the following relief:

    a.  economic damages in an amount to be determined at trial but no less than One Million and Five Hundred Thousand ($1,500,000.00) Dollars; and

    b.  compensatory damages in the amount of not less than Two Hundred and Fifty Thousand ($250,000.00) Dollars; and

    c.  Punitive damages in the amount of not less than Two Hundred and Fifty Thousand ($500,000.00) Dollars; and

    d.  attorneys' and expert fees and costs in an amount not presently capable of ascertainment.

## AS AND FOR A SECOND CLAIM FOR RELIEF
(Retaliation Under Title VII)

70.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "69" as if set forth in full herein.

71.     Between 2006 and 2013, Plaintiff repeatedly objected to his supervisors and co-workers derogatory race and sex based comments. The CITY OF NEW YORK was aware of his complaints and instead of taking any action on his behalf, increased its hostility towards the Plaintiff.

72.     In 2008, Plaintiff made an anonymous complaint to the IAB about the way supervisors were treating the "black guy" in the Unit. Plaintiff was the only "black guy" in the Unit. The NYPD was aware that the Plaintiff made the complaint.

73.     Immediately following the Plaintiff's complaint, the Plaintiff was transferred to a new squad, was assigned to desk-duty for one month, and was subjected to unwarranted discipline.

74.     In February of 2012, SMITH complained to Defendant REYNOLDS about the discriminatory treatment.

75.     Following his complaint, in the summer of 2012, SMITH was brought up on Charges and Specs and issued a CD. Both disciplinary charges included warrantless infractions for which SMITH had already been penalized.

76.     In April of 2013, Plaintiff complained to XO Russo about the discriminatory treatment. Russo forwarded the complaint to the OEEO. OEEO contacted Smith and interviewed him on his claims.

77.     Immediately thereafter, Smith was removed from active duty and transferred to

21

the SOD Wheel and was informed that because he had "unresolved" Charges and Specs that he would not be able to retire on active duty and thereby receive a good guy letter. However, the Charges and Specs were resolved a year earlier with the penalty of a thirty day suspension and since that time Smith had not been informed of any additional charges.

78.     The CITY OF NEW YORK's intentional retaliation against Plaintiff violates Plaintiff's federally protected rights under Title VII.

79.     CITY OF NEW YORK's conduct was intentional, malicious and in reckless disregard of Plaintiff's protected rights under the federal civil rights laws.

80.     As a result of CITY OF NEW YORK's retaliation against Plaintiff, Plaintiff has sustained injury to his career and has suffered stress and economic damages and other injury.

81.     By reason of the foregoing, Defendant has violated Title VII of the Civil Rights Act and Plaintiff is entitled to the following relief:

a.   economic damages in an amount to be determined at trial but no less than One Million Five Hundred Thousand ($1,500,000.00) Dollars; and

b.   compensatory damages in the amount of not less than Two Hundred and Fifty Thousand ($250,000.00) Dollars; and

c.   Punitive damages in the amount of not less than Five Hundred Thousand ($500,000.00) Dollars; and

d.   attorneys' and expert fees and costs in an amount not presently capable of ascertainment.

## AS AND FOR A THIRD CLAIM FOR RELIEF
(Discrimination Under §1981)

82.     Plaintiff repeats and realleges each and every allegation contained in paragraphs

22

"1" through "81" inclusive with the same force and effect as though more fully set forth herein again and length.

83.    Plaintiff has been subjected to discrimination, on account of his race, that has interfered with his protected rights under §1981 to enjoy all of the "benefits, privileges, terms and conditions of the contractual relationship."

84.    When Defendants DRISCOLL, REYNOLDS, SULLIVAN, HARKINS and CHYLINSKI denied Plaintiff overtime, career-enhancing training, and prestigious assignments and subjected him to a hostile work environment because of his race, they interfered with Plaintiff's contractual entitlement to receive the same benefits and privileges of his Caucasian counterparts.

85.    The denial of Plaintiff's contractual rights was intentional, malicious and otherwise in reckless disregard of Plaintiff's rights under §1981.

86.    Defendants    DRISCOLL,    REYNOLDS,    SULLIVAN,    HARKINS    and CHYLINSKI were personally involved denying the Plaintiff overtime, career-enhancing training, and prestigious assignments and subjecting the Plaintiff to a hostile work environment.

87.    Defendant DRISCOLL was grossly negligent in the supervision of his subordinates who committed the wrongful acts and failed to take action upon receiving information about the discrimination.

88.    As a result of Defendants DRISCOLL, REYNOLDS, SULLIVAN, HARKINS and CHYLINSKI's interference with Plaintiff's contractual rights, Plaintiff has sustained injuries to his career and has suffered economic and emotional injuries.

   a.   economic damages in an amount to be determined at trial but no less than One

Million and Five Hundred Thousand ($1,500,000.00) Dollars; and

b. compensatory damages in the amount of not less than Two Hundred and Fifty Thousand ($250,000.00) Dollars; and

c. Punitive damages in the amount of not less than Two Hundred and Fifty Thousand ($500,000.00) Dollars; and

d. attorneys' and expert fees and costs in an amount not presently capable of ascertainment.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
(Retaliation Under §1981)

89.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "88" as if set forth in full herein.

90.    Between 2006 and 2013, Plaintiff repeatedly objected to his supervisors and co-workers derogatory race and sex based comments.

91.    Defendants CITY OF NEW YORK and DRISCOLL, REYNOLDS, SULLIVAN, HARKINS and CHYLINSKI were aware of his complaints and instead of taking any action on his behalf, retaliated against the Plaintiff.

92.    Defendants' retaliation interfered with his protected rights under §1981 to enjoy all of the "benefits, privileges, terms and conditions of the contractual relationship."

93.    In 2008, Plaintiff made an anonymous complaint to the IAB about the way supervisors were treating the "black guy" in the Unit. Plaintiff was the only "black guy" in the Unit. The NYPD was aware that the Plaintiff made the complaint.

94.    Immediately following the Plaintiff's complaint, Defendants transferred to a new squad, was assigned to desk-duty for one month, and was subjected to unwarranted discipline.

24

95.    In February of 2012, SMITH complained to Defendant REYNOLDS about the discriminatory treatment.

96.    Following his complaint, in the summer of 2012, Defendants brought SMITH up on Charges and Specs and issued a CD. Both disciplinary charges included warrantless infractions for which SMITH had already been penalized.

97.    In April of 2013, Plaintiff complained to XO Russo about the discriminatory treatment. Russo forwarded the complaint to the OEEO. OEEO contacted Smith and interviewed him on his claims.

98.    Immediately thereafter, Defendants removed Smith from active duty and transferred to the SOD Wheel and was informed that because he had "unresolved" Charges and Specs that he would not be able to retire on active duty and thereby receive a good guy letter. However, the Charges and Specs were resolved a year earlier with the penalty of a thirty day suspension and since that time Smith had not been informed of any additional charges.

99.    Defendants' retaliation against Plaintiff was intentional, malicious and otherwise in reckless disregard of Plaintiff's rights under §1981.

100.    As a result of Defendants' retaliation against Plaintiff, Plaintiff has sustained injury to his career and has suffered stress and economic damages and other injury

101.    As a result of Defendants' retaliation against Plaintiff, Plaintiff has sustained injuries to his career and has suffered economic and emotional injuries.

    a.    economic damages in an amount to be determined at trial but no less than One Million and Five Hundred Thousand ($1,500,000.00) Dollars; and

    b.    compensatory damages in the amount of not less than Two Hundred and Fifty

Thousand ($250,000.00) Dollars; and

c.  Punitive damages in the amount of not less than Two Hundred and Fifty Thousand ($500,000.00) Dollars; and

d.  attorneys' and expert fees and costs in an amount not presently capable of ascertainment.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Discrimination under New York State Human Rights Law)

102.  Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "101" inclusive with the same force and effect as though more fully set forth herein again and length.

103.  Executive Law §291 provides, in pertinent part, that "the opportunity to obtain employment without discrimination because of race, sex or national origin is hereby recognized and declared to be a civil right."

104.  Defendants discriminated against Plaintiff on account of his race and sex by denying him overtime, career enhancing training and prestigious assignments.

105.  Defendants subjected Plaintiff to a hostile work environment on account of his race and his sex (based on gender stereotypes) by subjecting him to unwarranted discipline, derogatory comments and by making his work environment so intolerable that Plaintiff was forced to leave his employment prior to twenty years.

106.  Defendants DRISCOLL, REYNOLDS, SULLIVAN, HARKINS and CHYLINSKI, at all relevant times, had the authority to make personnel decisions within the NYPD.

107.  Defendants DRISCOLL, REYNOLDS, SULLIVAN, HARKINS and

CHYLINSKI, at participated in the conduct giving rise to Plaintiff's discrimination claim by denying him career enhancing training and overtime.

108.    Defendants DRISCOLL, REYNOLDS, SULLIVAN, HARKINS and CHYLINSKI aided and abetted the CITY OF NEW YORK's discriminatory conduct against the Plaintiff by participating in the conduct giving rise to Plaintiff's claims of discrimination.

109.    As a result of Defendants' intentional discrimination against Plaintiff, Plaintiff has sustained injury to his career, has suffered stress and economic damages and other injury.

110.    By reason of the foregoing, Defendants have violated Article 15 of the New York State Executive Law, specifically Executive Law §§ 290 et seq., 296 and 297 and Plaintiff is entitled to the following relief:

      a.    economic damages in an amount to be determined at trial but no less than One Million Five Hundred Thousand ($1,500,000.00) Dollars; and

      b.    compensatory damages in the amount of not less than Two Hundred and Fifty Thousand ($250,000.00) Dollars.

### AS AND FOR A SIXTH CLAIM FOR RELIEF
(Retaliation Under New York State Human Rights Law)

111.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "110" inclusive with the same force and effect as though more fully set forth herein again and length.

112.    Between 2006 and 2013, Plaintiff repeatedly objected to his supervisors and co-workers derogatory race and sex based comments. The Defendants were aware of his complaints and instead of taking any action on his behalf, increased their hostility towards the Plaintiff.

113.    In 2008, Plaintiff made an anonymous complaint to the IAB about the way

supervisors were treating the "black guy" in the Unit. Plaintiff was the only "black guy" in the

Unit. The NYPD was aware that the Plaintiff made the complaint.

114.    Immediately following the Plaintiff's complaint, the Plaintiff was transferred to a

new squad, was assigned to desk-duty for one month, and was subjected to unwarranted

discipline.

115.    In February of 2012, SMITH complained to Defendant REYNOLDS about the

discriminatory treatment.

116.    Following his complaint, in the summer of 2012, SMITH was brought up on

Charges and Specs and issued a CD. Both disciplinary charges included warrantless infractions

for which SMITH had already been penalized.

117.    In April of 2013, Plaintiff complained to XO Russo about the discriminatory

treatment. Russo forwarded the complaint to the OEEO. OEEO contacted Smith and interviewed

him on his claims.

118.    Immediately thereafter, Smith was removed from active duty and transferred to

the SOD Wheel and was informed that because he had "unresolved" Charges and Specs that he

would not be able to retire on active duty and thereby receive a good guy letter. However, the

Charges and Specs were resolved a year earlier with the penalty of a thirty day suspension and

since that time Smith had not been informed of any additional charges.

119.    Defendants    DRISCOLL,    REYNOLDS,    SULLIVAN,    HARKINS    and

CHYLINSKI, at all relevant times, had the authority to make personnel decisions within the

NYPD.

120.    Defendants    DRISCOLL,    REYNOLDS,    SULLIVAN,    HARKINS    and

CHYLINSKI, at all relevant times, participated in the conduct giving rise to Plaintiff's retaliation claim.

121.    Defendants    DRISCOLL,    REYNOLDS,    SULLIVAN,    HARKINS    and CHYLINSKI aided and abetted the CITY OF NEW YORK's retaliatory conduct against the Plaintiff by participating in the conduct giving rise to Plaintiff's claims of retaliation.

122.    Defendants' intentional retaliatory conduct violates the New York State Human Rights Law.

123.    As a result of Defendants' retaliation, Plaintiff has sustained injury to his career, has suffered stress and economic damages and other injury.

124.    By reason of the foregoing, Defendants have violated the New York State Human Rights laws and Plaintiff is entitled to the following relief:

   a.  economic damages in an amount to be determined at trial but no less than One Million Five Hundred Thousand ($1,500,000.00) Dollars; and

   b.  compensatory damages in the amount of not less than Two Hundred and Fifty Thousand ($250,000.00) Dollars.

### AS AND FOR A SEVENTH CLAIM FOR RELIEF
(Discrimination under NYC Administrative Code)

125.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "124" inclusive with the same force and effect as though more fully set forth herein again and length.

126.    Defendants discriminated against Plaintiff on account of his race and sex / gender by denying him overtime, career enhancing training and prestigious assignments.

127.    Defendants subjected Plaintiff to a hostile work environment on account of his

29

race and his sex (based on gender stereotypes) and his perceived sexual orientation by subjecting him to unwarranted discipline, derogatory comments and by making his work environment so intolerable that Plaintiff was forced to leave his employment prior to twenty years.

128.     Defendants DRISCOLL, REYNOLDS, SULLIVAN, HARKINS and CHYLINSKI, at all relevant times, had the authority to make personnel decisions in the NYPD.

129.     Defendants DRISCOLL, REYNOLDS, SULLIVAN, HARKINS and CHYLINSKI, at all relevant times, participated in the conduct giving rise to Plaintiff's discrimination claim by denying him career enhancing training and overtime.

130.     Defendants DRISCOLL, REYNOLDS, SULLIVAN, HARKINS and CHYLINSKI aided and abetted the CITY OF NEW YORK's discriminatory conduct against the Plaintiff by participating in the conduct giving rise to Plaintiff's claims of discrimination.

131.     Defendants' conduct was intentional, malicious and otherwise in reckless disregard of Plaintiff's protected rights in violation of the New York City Human Rights Laws, N.Y.C. Admin. Code Sections 8-107(1), 8-107(2) and 8-107(3).

132.     As a result of Defendants' intentional discrimination against Plaintiff, Plaintiff has sustained injury to his career and has suffered economic and emotional injuries.

133.     By reason of the foregoing Plaintiffs are entitled to the following:

    a.  economic damages in an amount to be determined at trial but no less than One Million Five Hundred Thousand ($1,500,000.00) Dollars; and

    b.  compensatory damages in the amount of not less than Two Hundred and Fifty Thousand ($250,000.00) Dollars; and

    c.  Punitive damages in the amount of not less than Five Hundred Thousand

($500,000.00) Dollars; and

   d.  attorneys' and expert fees and costs in an amount not presently capable of ascertainment.

## AS AND FOR A EIGHTH CLAIM FOR RELIEF
### (Retaliation Under NYC Administrative Code)

134.  Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "133" inclusive with the same force and effect as though more fully set forth herein again and length.

135.  Between 2006 and 2013, Plaintiff repeatedly objected to his supervisors and co-workers derogatory comments. The Defendants were aware of his complaints and instead of taking any action on his behalf, increased their hostility towards the Plaintiff.

136.  In 2008, Plaintiff made an anonymous complaint to the IAB about the way supervisors were treating the "black guy" in the Unit. Plaintiff was the only "black guy" in the Unit. The NYPD was aware that the Plaintiff made the complaint.

137.  Immediately following the Plaintiff's complaint, the Plaintiff was transferred to a new squad, was assigned to desk-duty for one month, and was subjected to unwarranted discipline.

138.  In February of 2012, SMITH complained to Defendant REYNOLDS about the discriminatory treatment.

139.  Following his complaint, in the summer of 2012, SMITH was brought up on Charges and Specs and issued a CD. Both disciplinary charges included warrantless infractions for which SMITH had already been penalized.

140.  In April of 2013, Plaintiff complained to XO Russo about the discriminatory

treatment. Russo forwarded the complaint to the OEEO. OEEO contacted Smith and interviewed him on his claims.

141.   Immediately thereafter, Smith was removed from active duty and transferred to the SOD Wheel and was informed that because he had "unresolved" Charges and Specs that he would not be able to retire on active duty and thereby receive a good guy letter. However, the Charges and Specs were resolved a year earlier with the penalty of a thirty day suspension and since that time Smith had not been informed of any additional charges.

142.   Defendants   DRISCOLL,   REYNOLDS,   SULLIVAN,   HARKINS   and CHYLINSKI, at all relevant times, had the authority to make personnel decisions within the NYPD.

143.   Defendants   DRISCOLL,   REYNOLDS,   SULLIVAN,   HARKINS   and CHYLINSKI, at all relevant times, participated in the conduct giving rise to Plaintiff's retaliation claim.

144.   Defendants   DRISCOLL,   REYNOLDS,   SULLIVAN,   HARKINS   and CHYLINSKI aided and abetted the CITY OF NEW YORK's retaliatory conduct against the Plaintiff by participating in the conduct giving rise to Plaintiff's claims of retaliation.

145.   Defendants' conduct was intentional, malicious and otherwise in reckless disregard of Plaintiff's protected rights in violation of the New York City Human Rights Laws, N.Y.C. Admin. Code Sections 8-107(1), 8-107(2) and 8-107(3).

146.   As a result of Defendants' intentional retaliation against Plaintiff, Plaintiff has sustained injury to his career and has suffered economic and emotional injuries.

147.   By reason of the foregoing Plaintiffs are entitled to the following:

a. Economic damages in an amount to be determined at trial but no less than One Million Five Hundred Thousand ($1,500,000.00) Dollars; and

b. compensatory damages in the amount of not less than Two Hundred and Fifty Thousand ($250,000.00) Dollars; and

c. Punitive damages in the amount of not less than Five Hundred Thousand ($500,000.00) Dollars; and

d. attorneys' and expert fees and costs in an amount not presently capable of ascertainment.

## DEMAND FOR TRIAL BY JURY

148.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the complaint.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that judgment against Defendant be granted as follows:

a.  On the FIRST CLAIM FOR RELIEF, against defendant, a judgment in favor of plaintiff in an amount to be determined at trial but in no event less than $2,250,000 plus attorneys' fees;

b.  On the SECOND CLAIM FOR RELIEF, against defendant, a judgment in favor of plaintiff in an amount to be determined at trial but in no event less than $2,250,000 plus attorneys' fees;

c.  On the THIRD CLAIM FOR RELIEF, against defendant, a judgment in favor of plaintiff in an amount to be determined at trial but in no event less than $2,250,000 plus

attorneys' fees;

d. On the FOURTH CLAIM FOR RELIEF, against defendant, a judgment in favor of plaintiff in an amount to be determined at trial but in no event less than $2,250,000 plus attorneys' fees;

e. On the FIFTH CLAIM FOR RELIEF, against defendant, a judgment in favor of plaintiff in an amount to be determined at trial but in no event less than $1,750,000;

f. On the SIXTH CLAIM FOR RELIEF, against defendant, a judgment in favor of plaintiff in an amount to be determined at trial but in no event less than $1,750,000;

g. On the SEVENTH CLAIM FOR RELIEF, against defendant, a judgment in favor of plaintiff in an amount to be determined at trial but in no event less than $2,250,000 plus attorneys' fees;

h. On the EIGHTH CLAIM FOR RELIEF, against defendant, a judgment in favor of plaintiff in an amount to be determined at trial but in no event less than $2,250,000 plus attorneys' fees;

i. Such other relief as the Court deems proper, together with the costs and disbursements of this action.

Dated:        New York, New York
              October 1, 2014

                              SIEGEL TEITELBAUM & EVANS, LLP:

                              By: _____
                                    Norman Siegel

                              By: _____
                                    Herbert Teitelbaum
                                    Sharon Sprayregen
                                    260 Madison Avenue, 22 Floor
                                    New York, NY 10016
                                    (212) 455-0300

                              LAW OFFICE OF RACHEL NICOTRA:

                              By: _____
                                    Rachel Nicotra
                                    33 West 19th St, 4th Floor
                                    New York, NY 10011
                                    (646) 462-3960

35